PER CURIAM.
This is an appeal from an order upholding certain rules[1] promulgated by the Florida Department of Agriculture and Consumer Services (Department) involving methods for sampling commercial fertilizer.
The majority of fertilizer produced in Florida is bulk mixed fertilizer. This type of fertilizer is produced by blending various ingredients according to a prescribed formula called a “guaranteed analysis.” This process is initiated by consumer requests for fertilizer of a specific guaranteed analysis. After receiving this request, the ingredients are obtained from storage bins and blended in a mixer. The finished product is then loaded onto trucks for transportation to the consumer’s field.
The Department’s division of inspection performs the function of sampling commercial fertilizer sold or offered for sale within Florida under the provisions of chapter 576, Florida Statutes, and rules adopted by the Department. Fertilizer samples are taken either at the manufacturing plant or in the field by division inspectors utilizing standard procedures set forth in the Department’s rules. The samples are then analyzed to determine if the fertilizer is within a permitted range of tolerance from the guaranteed analysis. When samples show a deficiency in a fertilizer ingredient below the applicable tolerance, the Department is authorized to assess penalties payable by the seller to the consumer.
Prior to 1971, official samples of bulk mixed fertilizer were only taken from the conveyor belt at the plant with tools authorized by then existing rules. In that year, the Department adopted rules for taking samples in the field through the use of the Missouri D probe, and because it was recognized that there was more possibility of an error by sampling in the field, the tolerances were increased for field sampling. In 1980 the appellants, comprising thirty fertilizer manufacturers and their industry representatives, filed a petition with the Division of Administrative Hearings challenging the validity of the rules which authorized the use of the Missouri D probe and the tolerance tables. The appellants pointed out that since 1976 the Department had annually assessed penalties against *1155 them through the use of the questioned sampling procedure which totalled more than $400,000 a year. Following a hearing, the division’s hearing officer entered a comprehensive order denying the appellants’ claims.
The enabling legislation for the rules in question is chapter 576, Florida Statutes. Section 576.051(7), Florida Statutes (1979), states:
(7) In drawing any official sample and in making any analysis the officially adopted methods and terminology of the Association of Official Analytical Chemists shall be used. In cases not covered by such officially adopted methods and terminology, the department shall, as soon as practicable, adopt and publish appropriate methods and terminology. In any instance in which the officially adopted methods and terminology of the Association of Official Analytical Chemists are not applicable to conditions, circumstances, or cases in the state, then the department shall, with the approval of the technical council, adopt by regulation methods and terminology which shall be official in the state.
Appellants concede the validity of a statute requiring an agency to promulgate the standard of another entity as its own but emphasize that the agency may only adopt those standards which were in existence at the time the statute was enacted. See Department of Legal Affairs v. Rogers, 329 So.2d 257 (Fla.1976); Florida Industrial Commission v. State, 155 Fla. 772, 21 So.2d 599 (1945). Appellants point out that section 576.051(7) became effective on January 1. 1966, but the Missouri D probe was not adopted as an official sampling tool by the Association of Official Analytical Chemists until 1967. Therefore, they contend that the Department’s rules which adopted the Missouri D probe in 1971 constituted an unlawful delegation of legislative authority.
We reject this contention. In 1971 the Department decided to institute field sampling. Accepting appellants’ argument that it had no authority under the first sentence of subsection (7) to adopt the AOAC approved method of using the Missouri D probe, the Department was left with the alternative of selecting its own method for field sampling under the balance of the subsection. The Department decided to adopt the Missouri D probe as its own field sampling method, and the fact that the AOAC had adopted the same method subsequent to January 1,1966, was irrelevant. Moreover, any existing deficiencies in the standards were cured by the passage of Chapter 76-35, Laws of Florida, in which the legislature made substantial revisions in chapter 576 effective on January 1, 1977.[2] This had the effect of updating the provisions of section 576.051(7) to include officially adopted methods of the AOAC as of January 1, 1977.[3] State v. Rodriguez, 365 So.2d 157 (Fla.1978). Thereafter, there could be no doubt of the Department’s authority to prescribe the use of the Missouri D probe.
To follow appellants’ next argument, it is necessary to understand that the ingredients in most Florida bulk mixed fertilizers segregate when they are physically handled. This phenomenon occurs because the ingredients are composed of nonuniform size particles. As long as the fertilizer is sampled from the conveyor belt in the plant, the tolerance tables adequately compensate for any error in sampling. How *1156 ever, when the fertilizer is poured into the trucks, it forms conical piles in which the larger particles fall away to the side and the smaller particles remain in the middle. There is evidence that the segregation caused by coning could be alleviated if the manufacturers utilized relatively inexpensive deconing equipment at the time the trucks are loaded, but they have not chosen to do so. In any event, some further segregation can occur during transportation so that by the time the fertilizer reaches the field, there is an increased possibility of sampling error. Appellants admit that the Missouri D probe is the best scientific tool available for making field samples. They argue, however, that because of the high incidence of inaccuracy, the continued use of the Missouri D probe for field sampling is arbitrary and capricious.
In essence, appellants are seeking an end to field sampling on the premise that it is impossible to obtain totally accurate samples under existing technology. The Department responds that by limiting its sampling to the manufacturing plant, it cannot insure that the consumer will ultimately receive in the field a uniformly blended product. Upon consideration, we find competent and substantial evidence to support the hearing officer’s conclusion that while the Missouri D probe is not one hundred percent accurate, the Department’s expanded tolerance tables adequately compensate for such errors as occur in field sampling. See S. H. Goss, Inc. v. Pennsylvania Department of Agriculture, 58 Pa.Commw. 516, 428 A.2d 731 (1981) (fertilizer sampling methods upheld against a constitutional attack that they were inherently inaccurate).
Finally, appellants assail the tolerance tables themselves[4] because the permitted deviations in nutrient percentages are set forth in steps rather than on a smoothly graduated basis, thereby permitting certain inaccuracies, either upward or downward, to occur when the guaranteed nutrient percentages fall at the extreme ends of the steps. The standard for measuring the validity of these tables is whether they are arbitrary or capricious. See Agrico Chemical Co. v. Department of Environmental Regulation, 365 So.2d 759 (Fla. 1st DCA 1978). We cannot say that upon the evidence before him, the hearing officer erred in determining that the appellants failed to carry the burden of their attack. The tolerances were only adopted after appropriate study and upon the recommendation of the Fertilizer Technical Council. They closely parallel the tolerances recommended by the Association of American Plant Food Control Officers. The fact that refinements in the table could alleviate some inaccuracies which may occur under certain circumstances does not warrant striking down the tables in their entirety.
The balance of appellants’ contentions are without merit and need not be discussed.
AFFIRMED.
BOARDMAN, A. C. J., and GRIMES and RYDER, JJ., concur.

. Fla.Admin.Code Rules 5E-1.09(l)(c), 5E-L-09(2)(c), and 5E-1.11(1).

. Following the enactment of chapter 76-35, the Department amended its fertilizer rules as of January 1, 1977, but retained the use of the Missouri D probe for field sampling.

. Appellants suggest that chapter 76-35 did not indicate a clear legislative intent to update the testing standards because it only altered subsection (7) to reflect a change of name in the testing organization. To the contrary, chapter 76-35 made significant changes in the regulation of fertilizer sales, and the insertion of the new name of the testing organization constituted a legislative recognition of the ongoing work of that organization in adopting new testing methods. In any event, if chapter 76-35 were deemed insufficient as a legislative update, there would be no AOAC approved method for field sampling within the contemplation of section 576.051(7) so the Department’s designation of the Missouri D probe as its own sampling method would continue to be valid.

. Section 576.051, Florida Statutes (1979), directs the Department to establish tolerances.