407 So.2d 238 (1981)
STATE DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Appellant,
v.
FRAMAT REALTY, INC. and Arthur M. Elliott, Appellees.
No. AB-496.
District Court of Appeal of Florida, First District.
November 18, 1981.
Rehearing Denied December 18, 1981.
*239 Steven W. Huss, Tallahassee, for appellant.
Michael Egan and Jane Heerema, of Roberts & Egan, Tallahassee, for appellees.
Stephen W. Metz, Tallahassee, for Florida Home Builders Ass'n, amicus curiae.
ROBERT P. SMITH, Jr., Chief Judge.
The Department of Health and Rehabilitative Services appeals an order by a hearing officer of the Division of Administrative Hearings declaring invalid the Department's 1979 rule governing septic tank use in residential subdivisions. Section 120.56, Fla. Stat. (1979). The hearing officer concluded that in promulgating the rule the Department both exceeded its statutory authority and failed to prepare an adequate statement of the economic impact of the rule. We hold the rule was valid as against appellees' claim that it exceeds the scope of the substantive statute the rule elucidates; this interpretative rule is valid because it represents a permissible interpretation that has been validated by public rulemaking processes that are designed to test and refine the agency's policy. However, we agree with the hearing officer's finding that the rule is invalid because its economic impact statement is inadequate by Chapter 120 standards.
This dispute involves interpretation of one of several statutes regulating use of individual septic tanks in Florida, an area of public health specifically committed to the Department's general supervision and control. Section 381.261, Fla. Stat. (1979). The statute in question, section 381.272(7), Fla. Stat. (1979), authorizes use of septic tanks as follows:
Notwithstanding any other provisions of this chapter, residential subdivisions with a public water system may utilize individual sewage disposal facilities, provided there are no more than four lots per acre and that all distance and setback, soil condition, water table elevation, and other related requirements which are generally applicable to the use of individual sewage disposal systems are met. (Emphasis added.)
Prior to 1979 amendment, the 1977 statute authorized septic tank use provided there were no more than "two lots per acre."
*240 To gather views on implementing the 1977 statute and to explore general changes in its septic tank regulations, the Department held a workshop in February 1979, receiving recommendations from the Florida Home Builders Association, the Florida Septic Tank Association and the Department of Environmental Regulation. Also under discussion, as a means of implementing the statute, was a "net acre" concept that in calculating "lots per acre" does not count acreage in roads, lakes and certain other areas within a given subdivision. In June 1979, the Department issued notice of a regular section 120.54(3) public hearing on two proposed rules limiting use of septic tanks under section 381.272(7) to subdivisions with two lots per "net usable acre," excluding lands devoted to common uses and bodies of water. Again interested persons, this time including the Florida Association of Realtors, appeared at the hearing and pressed their views.
Eventually, with the benefit of this input, the Department adopted the rule under challenge, Rule 10D-6.23(3)(g), Florida Administrative Code. As a predicate, Rule 10D-6.23(3)(f) was written:
Notwithstanding any other provisions of this Chapter, residential subdivisions with a public water system may utilize individual sewage disposal facilities provided there are no more than four (4) lots per acre and acre [sic] and that all distance and setback, soil condition, water table elevation and other related requirements which are generally applicable to the use of individual sewage disposal systems are met.
And Rule 10D-6.23(3)(g) provides:
Whenever individual sewage disposal systems are used under the provisions of Section 10D-6.23(3)(f), an acre, as defined elsewhere in this Chapter [defined in Rule 10D-6.22(3) as 43,560 square feet of land], shall not include the following: paved areas, paved and unpaved rights of ways, paved roadways, consolidated buildings, foundation drainage, underground water drainage, streams, lakes, ditches, coastal, waters and marshes. Within any given acre where lots abut open lands, such as golf courses, parks and other open unused areas that are not subject to development, the requirements of Section 10D-6.23(3)(f) may be diminished by not more than ten (10) percent for those lots abutting the open lands, provided that said open lands are not developed, provided further that all distance and set back, soil condition, water table elevation and other related requirements of Chapter 10D-6 are met.
In practice, according to the Department's environmental health administrator, the rule requires a developer to show, as a condition to installing septic tanks on a platted lot or lots, that the subject lot and any three contiguous lots, excluding the specified common areas platted by the developer, make up at least an acre. An individual lot owner seeking a septic tank permit without regard to the size of the lots around him must have a lot containing at least one-quarter acre. This "four per acre" test, in the words of this administrator, is designed to get "the sewage spread homogenously, if possible, throughout that subdivision."
The Department urges that its use of a "net acre" concept in defining the statutory "four lots per acre" is in keeping with its statutory duty to protect the public health through safe disposal of sewage. This duty, the Department maintains, is reflected in language of section 381.272(7), conditioning septic tank use on satisfaction of "other related requirements which are generally applicable to the use of individual sewage disposal systems." Appellees, on the other hand, contend the statute permits septic tanks on every lot of a subdivision if the total acreage in the development, divided by the number of lots, yields an average density of less than four lots per acre. Under this interpretation, every lot in appellees' Monroe County subdivision would qualify for a septic tank, regardless of the size of any individual lot and regardless of the local concentration of numerous small lots, because the whole subdivision contains 50 lots on 12.8 acres, or a "gross" density of *241 3.93 lots per acre. The Department counters that this interpretation is absurd from a public health standpoint, because it would allow a developer to install large numbers of septic tanks densely in a very small section of his subdivision as long as acreage elsewhere in the subdivision, undeveloped or devoted to less intensive uses, reduces the overall average sufficiently.
We reverse the hearing officer's order invalidating the rule as beyond the Department's statutory authority. Whether the Department's interpretation of section 381.272(7) is the only possible interpretation of the statute, or the most desirable one, we need not say. It is within the range of permissible interpretations of the statute, and that interpretation has acquired legitimacy through rulemaking processes in which those challenging the rule fully participated or had an opportunity to participate. We must remember here one prime goal of the 1974 Administrative Procedure Act: to encourage agencies of the executive branch to interpret statutes in their regulatory care deliberately, decisively, prospectively, and after consideration of comments from the general public and affected parties  that is, to interpret their statutes by rulemaking. We have repeatedly found that other APA processes press the executive inexorably toward rulemaking, although it is not required in all cases:
In McDonald v. Department of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977), the Court surveyed the adjudication and judicial review procedures of Chapter 120 and characterized them as pressing agencies to progress in the development of known policies within statutory limits by "moving from vague standards to definite standards to broad principles to rules." 346 So.2d 580, quoting K. Davis, Discretionary Justice 55 (1969).
In Hill v. School Board of Leon County, 351 So.2d 732, 733 (Fla. 1st DCA 1977), cert. denied, 359 So.2d 1215 (Fla. 1978), the Court noted that the APA rulemaking requirements are to some extent "self-enforcing" because affected agencies otherwise must "explicate and defend policy repeatedly" in individual adjudicatory proceedings when agency action affects the substantial interests of parties.
In Albrecht v. Department of Environmental Regulation, 353 So.2d 883, 886-87 (Fla. 1st DCA 1977), cert. denied, 359 So.2d 1210 (Fla. 1978), the Court pointed out that to the extent an agency "does not refine statutory standards through rulemaking it will be required to explain the policy behind each decision" made in individual cases.
In General Development Corp. v. Division of State Planning, Department of Administration, 353 So.2d 1199, 1209 (Fla. 1st DCA 1977), the Court again told agencies of their responsibility to limit their discretion through proceeding expeditiously to rulemaking. When an agency permissibly develops policies through orders in individual cases, the Court instructed, the agency must "expose and elucidate" its rationale.
In Florida Cities Water Co. v. Florida Public Service Commission, 384 So.2d 1280, 1281 (Fla. 1980), the Supreme Court, following McDonald, underscored the incentives for rulemaking by warning agencies that if they adopt policy in non-rule adjudicatory proceedings, the record of those proceedings must contain evidence to support their decisions.
In Anheuser-Busch, Inc. v. Department of Business Regulation, 393 So.2d 1177, 1182 (Fla. 1st DCA 1981), this Court further explicated the costs to an agency which declines to proceed by rule and develops policy in adjudicatory proceedings: the agency must create a "record foundation" of evidence supporting the "accuracy of every factual premise and the rationality of every policy choice." Id.
As these decisions consistently emphasize, the APA plainly regards rules as the valuable endpoint in the agency's development of policy. Rules represent an agency's considered decision on issues left to the agency's decision by a substantive act of the legislature. If we are to regard seriously the incentives for rulemaking under the APA scheme, and if we are to credit the deliberative process that the legislature has *242 prescribed for the development of agency policy, then surely an interpretative rule emerging from this process should be accorded a most weighty presumption of validity. Otherwise the elaborate statutory scheme, pressing for rulemaking and prescribing how it shall be accomplished with maximum public and private participation, has no productive purpose, and it has become only a snare for agency action, a device for the evasion, avoidance, or postponement of effective agency action in its authorized field of responsibility.
When as here an agency has responded to rulemaking incentives and has allowed affected parties to help shape the rules they know will regulate them in the future, the judiciary must not, and we shall not, overly restrict the range of an agency's interpretative powers. Permissible interpretations of a statute must and will be sustained, though other interpretations are possible and may even seem preferable according to some views. If the rule binds too tightly to suit them, the appellee developers have their proper remedy in the representative and politically responsive branches, the legislative or executive, but not in the judiciary, nor in Section 120.56 rule challenge proceedings before a hearing officer.
We affirm the hearing officer's order concluding that the Department's economic impact statement is insufficient. The record clearly demonstrates that the economic impact statement lacks the detail and thoughtful preparation contemplated by section 120.54(2). We approve the hearing officer's finding that
[T]he economic impact statement promulgated by Respondent in the rule-adoption process is erroneous in its conclusion that enactment of Chapter 10D-6, Florida Administrative Code, will result in a cost saving to developers of real estate. To the contrary, the record in this proceeding clearly establishes that the cost of developing a subdivision will increase as a result of the application of the challenged rule. The economic impact statement, because of its method of preparation, is not competent evidence of the facts recited therein, in that it was not prepared by a person or persons with demonstrated ability to make the determinations required by Section 120.54(2), Florida Statutes. In addition, neither of the methodology employed nor the data utilized by the agency in preparing the economic impact statement was sufficiently explicated so as to attach any credibility to the conclusions reached in the statement.
Cf. Florida-Texas Freight, Inc. v. Hawkins, 379 So.2d 944 (Fla. 1979).
Rule 10D-6.23(3)(g) represents an invalid exercise of delegated legislative power because the accompanying economic impact statement is inadequate. Without prejudice to the Department's reconsideration of the rule in section 120.54 rulemaking proceedings, the hearing officer's order is AFFIRMED in part and REVERSED in part.
JOANOS, J., concurs.
THOMPSON, J., concurs in part and dissents in part, with opinion.
THOMPSON, Judge, concurring in part and dissenting in part.
I concur with the court's affirmance of the hearing officer's Order regarding the inadequacy of the economic impact statement. Otherwise, however, I must respectfully dissent.
The primary issue on appeal is simply whether the Department may validly redefine the ordinary word "acre." In my opinion, this issue is controlled by State, Dept. of HRS v. McTigue, 387 So.2d 454 (Fla. 1st DCA 1980). In McTigue, this court addressed a situation where a statute used the ordinary word "physician," and the Department, via a rule, added the requirement that the physician must be a Florida physician. This court held that:
[a]pplying the rule of statutory construction that words are to be given their plain and ordinary meaning, it is obvious that a "physician", unless the wording of the statute or the context requires otherwise, could be a physician duly licensed under the laws of any state, not just Florida. By adding the requirement that the physician be a Florida physician the rule is an *243 invalid exercise of delegated legislative authority because it modifies the statute by adding an additional criterion to be met by the applicant.
Id. at 456. See also Freedman v. State Bd. of Accountancy, 370 So.2d 1168, 1169 (Fla. 4th DCA 1979).
Under McTigue, the Department had no authority to redefine the word "acre." This invalid redefinition cannot acquire legitimacy through the rulemaking process. An agency cannot use the rulemaking process to legitimate that which it had no authority to do in the first place.
As the majority points out, "[r]ules represent an agency's considered decision on issues left to the agency's decision by a substantive act of the legislature." But in the present case, there is no legitimate issue as to what an "acre" means. Of course, there may be an issue as to what is meant by the statute's use of the phrase "no more than four lots per acre." However the Department did not attempt to interpret by rule this "four lots per acre" limitation. Instead, the Department invalidly redefined the word "acre," which is not ordinarily subject to different interpretations.