## AMERICAN MEDICAL INTERNATIONAL, INC., and BROOKWOOD COMMUNITY HOSPITAL v. DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

### Case No. 83-3092R

State of Florida Division of Administrative Hearings

September 28, 1984

### APPEARANCES OF COUNSEL

**Fred W. Baggett** and **Michael J. Cherniga** for petitioners.

**M. Stephen Turner** for respondent.

### OPINION

WILLIAM E. WILLIAMS, Hearing Officer.

Pursuant to notice, the Division of Administrative Hearings, by its duly designated Hearing Officer, William E. Williams, held a public hearing in this cause on February 28, 1984.

This proceeding involves a challenge filed by Petitioners, American Medical International, Inc. ("AMI") and Brookwood Community Hospital ("Brookwood"), to the validity of Rules 10-17.001(3)(a), (5)(a), and 10-17.008, *Florida Administrative Code*, adopted by Respondent, Department of Health and Rehabilitative Services ("HRS"). Petitioners contend that the rules were formulated in an arbitrary and capricious manner; represent arbitrary and capricious agency action;

constitute an abuse of administrative discretion; are not reasonably related to the legitimate objectives and purposes of, and are not in compliance with, Florida's Certificate of Need Law; are illogical; do not satisfy, and are not rationally related to, the need for sound health planning; and that the "Summary of the Estimate of the Economic Impact of the Proposed Rule" for these rules is insufficient as a matter of law. Petitioners also contend that Section 381.494(7)(b), Florida Statutes, lacks proper standards to adequately delineate HRS' exercise of rulemaking discretion, and that any rule promulgated pursuant to that authority is therefore invalid.

At the final hearing in this cause, Petitioners called Peter F. Wahl, Phillip C. Rond, W. Eugene Nelson, Steven Yelenik, and Marilyn Dean as its witnesses. Petitioners offered Petitioners' Exhibits 1 through 5, which were received into evidence. HRS called no witnesses, but offered HRS Exhibits 1 through 21, which were received into evidence.

Counsel for both Petitioners and Respondent have submitted proposed findings of fact for consideration by the Hearing Officer. To the extent that those proposed findings of fact are not contained in this order, they have been specifically rejected, as being either irrelevant to the issues presented for determination, or as not supported by evidence of record.

## FINDINGS OF FACT

Petitioners challenge the validity of Rules 10-17.001(3)(a) and (5)(a), as well as 10-17.008. Rule 10-17.001 consists of a definition section for acronyms and other terms used within the text of Rules 10-17.001 through 10-17.012. Rules 10-17.008(1)(a)(2) and (4) designate Orange and Seminole Counties, respectively, as subdistricts within HRS District VII for purposes of planning for acute care bed need.

AMI has applied for a certificate of need to construct an acute care hospital in Orange County. In reviewing and evaluating the merits of the AMI application, HRS will apply the challenged rule in determining the need for the proposed facility but based upon the appropriateness, sufficiency, and availability of health care services within the subdistrict that may be served by the facility.

Brookwood Community Hospital is a general acute care hospital, owned by AMI, located in Orange County, Florida. Brookwood has a regular and ongoing planning process to determine future needs of the hospital and its patients. As a general acute care hospital, Brookwood is subject to certificate of need regulation by HRS, and is therefore subject to the requirements of the rule.

By promulgating Rule 10-5.11(23), Florida Administrative Code, HRS has established a "uniform bed need methodology" for determining the need for hospital beds in each of 11 HRS service districts in Florida, including District VII. Section 381.494(6)(c)1, Florida Statutes, requires HRS to review a certificate of need application in accordance with a local health plan adopted for the district in which the proposed facility is to be located. Local health plans for the various HRS districts are developed by Local Health Councils in each district. Those portions of the local health plans which HRS feels are necessary to review certificate of need applications are adopted as rules pursuant to Chapter 120, Florida Statutes, by HRS. The rules challenged in this proceeding were adopted by HRS in accordance with this procedure.

The "uniform bed need methodology" adopted by HRS in Rule 10-5.11(23) establishes the total number of beds needed in a particular district. The local health plans developed by the Local Health Councils, and adopted by HRS as rules, are used in allocating the total number of beds within a particular district to the various subdistricts.

Rule 10-5.11(23)(d), Florida Administrative Code, requires that the subdistricting element of local health plans be developed by the Local Health Council ". . . according to guidelines developed by [HRS]." These guidelines were developed by HRS, and were sent to the local Health Councils in April of 1983. Specifically, these guidelines provided as follows:

1. Local Health Council Districts should be divided into subdistricts for purposes of planning acute care general hospital services.

2. Rural subdistricts (i.e., those outside SMSAs) shall be county or multi-county areas.

3. Urban subdistricts (i.e., those including all or part of an SMSA) may be multicounty, county or subcounty areas. As appropriate, an urban subdistrict may include part of an urban county and all of an adjoining rural county.

4. All subdistrict designations shall conform to population base zone boundaries. Each urban subdistrict shall contain within it a sufficient number of population base zones to meet the following size criteria:

Minimum 150,000 to 200,000 population in base year 1980 unless the SMSA population is less than 150,000, in which case SMSA = subdistrict.

Maximum geographic area 25 miles diameter along longest axis.

5. Rural subdistricts shall be limited in size such that no area is

greater than 60 miles in diameter along its longest axis, or 45 minutes driving time to a general hospital for 90% of the population.

6. To the extent possible, subdistrict designations shall take into account existing patient flow patterns, and specialized services. 7. In dividing the total number of beds allocated to the district among subdistricts and specifying bed distribution by service category, the Local Health Council shall take into account the level of care offered by existing facilities, net flow to facilities, the age characteristics of the population as these relate to service needs and the potential degree of seasonal peak demands (as per the proposed acute care rule).

In August, 1983, the Local Health Council for District VII forwarded to HRS its local health plan entitled "Policies and Priorities for Community Medical Facilities Compondent." This document identified 23 policies, one of which was a designation of subdistricts within the district along county lines. Of the 23 policies enumerated, HRS adopted in Rule 10-17.008 only the policy designating subdistricts along county lines.

The subdistricting guidelines provided by HRS to Local Health Councils were considered advisory and not mandatory. The areas of concern delineated in the guidelines were features which each Local Health Council was urged to consider, subject to their ability to balance and adjust the various criteria according to their knowledge of local matters such as geography, population dynamics, and availability of an access to necessary services.

Under the HRS guidelines, Local Health Councils were not required to subdivide county units to form a subdistrict. In fact, counties are considered well established units for health planning purposes. In the District VII historically bed need has been allocated by county unit, even when the former health systems agencies were in effect. County subdivisions were then considered only for purposes of utilization or occupancy threshold. Many populous counties throughout Florida have been designated as subdistrict units, while others, with more discernible divisions, such as geographic characteristics, have been subdivided. This is the type of flexibility that was intended to be accomplished by the HRS guidelines.

The HRS guidelines required that subdistrict designations conform to population zoning boundaries so that no base zone was divided in the subdistricting process. Both the Orange and Seminole County subdistricts, which are challenged in this proceeding, comply with this guideline requirement.

171

Because of the peculiarities of population and geography, the designation of Seminole and Orange Counties as subdistricts could not meet the strict requirements of the 25-mile/150,000-200,000 population component of the guidelines. However, the Local Health Council did consider the factors of geographic and transportation patterns within the district, in determining, based upon its experience, that no.problem of access or availability to services would result from subdistricting along county lines.

The Local Health Council, in formulating its proposed subdistricting designation, considered 1978 patient flow information developed by its predecessor health systems agency, which showed significant movement of patients throughout Orange and Seminole Counties and into neighboring counties. In the council's judgment, this factor apparently militated against subdistrict divisions into subcounty area.

In addition, the Local Health Council determined that better population projections by age cohort were needed to plan below the county level. HRS, in determining overall bed need for a district, uses population projections based upon reports issued by the Bureau of Economic and Business Research of the University of Florida. These projections are made on a countywide basis. HRS has not promulgated official population projections for subcounty areas. The Local Health Council was advised by HRS that a study by Florida State University has been commissioned to establish subcounty age cohort projections, but that the study had not been completed. Because of what it considered to be the unavailability of accurate information on a subcounty level, the Local Health Council opted to subdistrict only to the county level, because of the easy availability of countywide data.

In the process of formulating its decision to subdistrict along county lines, the Local Health Council for District VII conducted public meetings open to providers to afford the entire medical community an opportunity to participate in the deliberations. No representative of Petitioners was present at those meetings. The issue of subdistricting was also discussed at three District VII board meetings during July through October, 1983.

An economic impact statement was prepared in conjunction with the adoption of the challenged rules. The economic impact statement outlined the cost to the agency associated with the implementation of the rule. The agency made an estimate of the types of costs and economic benefits associated with the adoption of the rule. There is no evidence of record which in any way establishes any defects in the economic impact statement, that Petitioners were in any way preju-

172

diced by that statement, or that the fairness of the rule adoption proceedings was impaired thereby.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the subject matter of, and the parties to this proceeding. Section 120.56, Florida Statutes.

2. Section 381.494(7)(b)1, Florida Statutes, requires Local Health Council to:

> Develop a district plan, using uniform methodology as set forth by [HRS] which will permit each local health council to develop goals and criteria based on its unique local health needs, such as the special health needs of rural areas in medically underserved communities. The district plan shall be submitted to [HRS] and updated periodically and shall be in a form prescribed by [HRS]. The elements of an approved district plan which are necessary to the review of any certificate-of-need application shall be adopted by [HRS] as part of its rules. . . .

3. Pursuant to the authority contained in Section 381.494(7)(b)1, Florida Statutes, the Local Health Council for District VII developed its local health plan, and HRS adopted the designation of Orange and Seminole Counties as subdistricts in Rule 10-17.008(1)(a)(2) and (4), respectively. In cases such as this, where an agency is given broad rulemaking authority of statute ". . . the validity of regulations promulgated thereunder will be sustained so long as they are reasonably related to the purposes of enabling legislation. . . ." *Florida Beverage Corporation v. Wynne*, 306 So.2d 200, 202 (Fla 1st DCA 1975).

In *Agrico Chemical Company v. State*, 365 So.2d 759, 763 (Fla. 1st DCA 1979), the court held that in a proceeding challenging a rule:

> . . . the hearing officer must look to the legislative authority for the rule and determine whether or not the . . . . rule was encompassed within that grant. The burden is upon one who attacks the . . . rule to show that the agency [has exceeded] its authority; that the requirements of the rule are not appropriate to the end specified in the legislative act; that the requirements contained in the rule are not reasonably related to the purpose of the enabling legislation or that the . . . rule or the requirements thereof are arbitrary or capricious.

> A capricious action is one which is taken without thought or reason or irrationally. An arbitrary decision is one not supported by facts or logic, or despotic. Administrative discretion must be reasoned and based upon competent substantial evidence. Competent substantial

173

evidence has been described as such evidence as a reasonable person would accept as adequate to support a conclusion.

In *Department of Health and Rehabilitative Services v. Framat Realty, Inc.*, 407 So.2d 238, 241-242 (Fla. 2st DCA 1981), the court held that:

. . . the APA plainly regards rules as the valuable end point in the agency's development of policy. Rules represent an agency's considered decision on issues left to the agency's decision by a substantive act of the legislature. If we are to regard seriously the incentives for rulemaking under the APA scheme, and if we are to credit the deliberative process that the legislature has prescribed for the development of agency policy, then surely an interpretative rule emerging from this process should be accorded a most weighty presumption of validity. Otherwise the elaborate statutory scheme, pressing for rulemaking and prescribing how it should be accomplished with maximum public and private participation, has no productive purpose, and it has become only a snare for agency action, a device for the evasion, avoidance, or postponement of effective agency action in its authorized field of responsibility.

When as here an agency has responded to rulemaking incentives and has allowed affected parties to help formulate the rules they know will regulate them in the future, the judiciary must not, and we shall not overly restrict the range of an agency's interpretative power. Permissible interpretations of a statute must and will be sustained, though other interpretations are possible, and may even seem preferable according to some views. If the rule binds too tightly to suit them, [litigants] have their proper remedy in the representative and politically responsive branches, the legislative or executive, but not in the judiciary, nor in Section 120.56 rule challenge proceedings before a hearing officer.

Here, the Local Health Council and HRS chose not to seek or utilize data which Petitioners argue might have dictated the subdistricting of Orange and Seminole Counties into subcounty units. However, the data utilized in the adoption of the challenged rule was sufficient to overcome any allegation that the result reached was arbitrary or capricious. In this regard ". . . the agency's interpretation of a statute need not be the sole possible interpretation or even the most desirable one; it need only be within the range of possible interpretations. . . ." *Department of Professional Regulation v Durrani*, Case No. AX-329 (Fla. 1st DCA, August 16, 1984).

4. There is no evidence of record in this cause to establish that the

economic impact statement accompanying the challenged rules was in any way defective, or that it in any way impaired the fairness of the rule adoption proceeding. Further, there is no evidence of record to establish the invalidity of Rules 10-17.001(3)(a) or (5)(a), and Petitioners have advanced no legal argument in its posthearing proposed order to support any findings of invalidity of those rules.

Accordingly, based upon the foregoing Findings of Fact and Conclusions of Law, it is

ORDERED:

That Petitioners, having failed to establish the invalidity of the challenged rules, the petition filed in this cause be, and the same is hereby, DISMISSED.