ERVIN, Judge.
Retail Grocers Association of Florida Self Insurers Fund and RGAF Underwriters (hereinafter Underwriters) appeal from a final order of the Florida Department of Labor and Employment Security, Division of Workers’ Compensation (Division) denying Underwriters’ petition for declaratory statement which sought approval of the disbursement of certain surplus investment earnings. We affirm.
Retail Grocers Association of Florida Self Insurers Fund (RGAF-SIF) was a self-insurer’s fund established under the provisions of Section 440.57, Florida Statutes, from October 1, 1962 until September 30, 1981, for the purpose of covering any workers’ compensation claims that might arise among the members of the Retail Grocers Association of Florida. The Retail Grocers Association is a trade association which consists of members of the wholesale and retail grocery industry in Florida.
On September 30, 1981, as a result of earlier action taken by the trustees of the self-insurer’s fund[1] (trustees), RGAF-SIF voluntarily relinquished its self-insurers’ status and terminated the writing of workers’ compensation insurance. On October 1, 1981, RGAF-Underwriters commenced operations as a reciprocal insurance exchange.
Between July 21 and October 1, 1981, the trustees and Division representatives devised an arrangement whereby the $3,750,-000 in funds then held by RGAF-SIF would be used to fund a surplus capital account for RGAF-Underwriters in the amount of $1,500,000, which represented surplus funds of participating members, and to establish a loss reserve trust (trust) initially funded with some $2,250,000. The trust, commonly referred to as a close-down trust, was created to pay any remaining workers’ compensation obligations that might arise.
The parties agreed that there was no requirement that any earnings or income *381 derived from the trust be retained for the payment of claims since the trustees had purchased an excess insurance policy which insured all losses incurred by the trust in excess of the funded amount ($2,250,000). These funds, which have been invested by the trustees into the close-down trust, have earned substantial income, and the trustees desired to distribute the income therefrom as investment income to RGAF-Underwrit-ers. The remainder of the principal sum in the fund was declared to be surplus and would be used to pay non-participating members their proportionate share of the surplus, or to pay any remaining surplus of participating members directly to RGAF-Underwriters, who had no membership status.
On January 14, 1982, the trustees distributed cheeks to non-participating members from the principal sum of the fund and transferred the remaining surplus of the participating members to RGAF-Under-writers. Each check to the non-participating members contained the following restrictive endorsement[2] on the reverse side thereof:
This payment is tendered in full settlement of accounts and the endorsement hereon by payee constitutes his acceptance.
On April 21, 1983, appellants formally requested authorization for a distribution to RGAF-Underwriters of $36,577 as accumulated investment income from the trust funds deposited at a St. Petersburg bank. This amount constituted twenty percent of the total income that had been earned on the trust since its inception on January 14, 1982.
On May 6, 1983, by letter, the Division’s general counsel agreed to the transfer of funds in the bank to RGAF-Underwriters only if RGAF-Underwriters obtained assignments of individual interests in the funds from all members, including those non-participating members who had previously received their shares from the principal sum remaining in the fund. This letter constituted proposed agency action which triggered the instant proceeding. There had previously been no objection by any non-participating member to the distribution of investment income to RGAF-Under-writers. Furthermore, the Division concedes that this income is not needed to ensure the security, financial stability, or solvency of the Fund.
On February 20, 1984, appellants filed their first amended petition for a declaratory statement, pursuant to Section 120.565, Florida Statutes, generally reciting the above facts, and requesting as relief from the Division the following: an acknowledgment that the trustees of the close-down trust are entitled to disbursement of all investment income from the funds held in the trust, and, upon notification from the trustees of their intent to distribute such funds to the Underwriters, authorization of such distribution to the latter, and finally a formal hearing.
Subsequent to the hearing that was conducted, the hearing officer issued his recommended order, stating, from his review of the pertinent statutes and rules, that the sole factor to be considered by the Division, when reviewing a request for distribution of surplus monies is whether such distribution would impair the financial solvency of the fund; therefore since it was conceded by the Division that the requested disbursement to the non-member Underwriters would not affect the fund’s financial stability, the Division should authorize the proposed distribution. On October 31, 1984, the Division issued its final order which adopted in part and rejected in part the hearing officer’s findings of fact and conclusions of law. The Division concluded that it had acted within the bounds of its authority in withholding its consent to release to the Underwriters the accumulated *382 investment income from the trust funds deposited in the St. Petersburg bank.
On appeal, the only issue of substance that we address is the question of whether the Division has exceeded its statutory authority by determining that it may regulate to whom disbursements of fund assets may be made. We agree with the Division’s argument that the hearing officer’s interpretation of the pertinent statutes and rules is unduly restrictive and does not take into proper account the broad powers conferred upon the Division by both the statute and the rules. We therefore affirm the order of the Division.
In so holding, we reiterate what the purpose of the declaratory statement is. It is simply a means of establishing “the agency’s opinion as to the applicability of a specified statutory provision or of any rule or order of the agency as it applies to the petitioner in his particular set of circumstances only.” Section 120.565. Since the declaratory statement procedure provides a means for resolving controversies or answering questions of doubts concerning the applicability of statutes, rules or orders, “the validity of the statute, rule or order is assumed. Therefore, the declaratory statement petition is not a vehicle for testing the validity of the matter on which the declaration is sought.” Waas, Initiating agency action: •petitions for declaratory statement and rulemaking under the Florida Administrative Procedure Act, 55 Fla.Bar.J. 43 (1981) (emphasis supplied). We must therefore presume the validity of all pertinent adopted rules on appeal. Certainly it was not within the scope of the hearing below, nor will we consider for the first time on appeal, whether any of the rules under which the Division purported to act represent an invalid exercise of delegated legislative authority.
The hearing officer’s recommended conclusion relied on Section 440.57, Florida Statutes, and Rules 38F-5.64(1) and 38F-5.-65(5), Florida Administrative Code, but ignored other provisions of the Code which the Division claims should have guided his judgment. We could agree with the hearing officer’s conclusion if the above authority was the only source for determining whether surplus income should be distributed.
Section 440.57(1), provides in pertinent part:
The division shall adopt rules permitting two or more employers to enter into agreements to pool their liabilities under this chapter for the purpose of qualifying as a group self-insurer’s fund, which shall be classified as a self-insurer, and each employer member of such approved group shall be known as a group self-insurer’s fund member and shall be classified as a self-insurer as defined in this chapter.
Additionally, section 440.57(2)(a) and (b) provides:
The division shall adopt rules:
(a) Requiring monetary reserves to be maintained by such self-insurers to insure their financial solvency; and
(b) Governing their organization and operation to assure compliance with such requirements.
(emphasis supplied) Rule 38F-5.64(1), relating to the trustees’ responsibilities, states in part: “In order to ensure the financial stability of the operations of each and every self-insurers fund, the board of trustees of each fund shall have complete fiscal control over the fund and shall be responsible for all operations of the fund.” (emphasis supplied)
Finally, the hearing officer placed particular emphasis upon Rule 38F-5.65(5), relating to the procedure for distributing surplus monies held in self-insurers’ funds:
Before approving any refund distribution request, the Division shall determine that such refund will not impair the financial solvency of the self-insurers fund. In any given fund year, the monies allocated to the loss fund shall not be.used for any purpose other than paying claims and authorized expenses until such time as surplus monies are eligible to be refunded. The intent of these rules is to ensure that sufficient monies are *383 retained so that total assets are greater than total liabilities in each fund year.
(emphasis supplied) The Division, however, refers to other provisions of the rules, requiring that distribution of surplus monies be made to members only. Among other things, it cites Rule 38F.565(1), providing: “Any surplus monies for a fund year in excess of the amount necessary to fulfill all obligations under the Law for that fund year may be declared refundable to members by the trustees at any time.” (emphasis supplied) It refers again to paragraph (2) of the same rule, empowering the trustees to “establish the criteria for determining the amount refundable to each member. ” (emphasis supplied) Moreover, paragraph (4) provides that surplus monies not needed to pay claims “may be refunded immediately after the end of the fund year upon the written approval of the Division.” (emphasis supplied) Rule 38F-5.53(3), provid-' ing for the establishment of group self-insurers, requires the execution of a form “binding each member of the group to comply with all provisions of the Florida Workers’ Compensation Law and the Rules and Regulations of the Division, .... ” (emphasis supplied)
That the Division has the authority to withhold approval of distribution of such surplus funds to only certain designated classes of persons is further evident from the following provisions of Rule 38F-5.-68(12): Among other things, paragraph (12) of the rule forbids distribution of dividends or accumulated reserve to members, “except at the discretion of the Trustees, upon application to and approval by the Division.” (emphasis supplied)
The Division has interpreted the above statutory and rule authority as allowing it, in the absence of explicit approval from all members, to withhold approval from disbursing surplus funds of a close-down trust to non-members, notwithstanding that such disbursement would have no effect on the financial solvency of the fund to pay claims. We cannot say, from our examination of all the pertinent rules, that the Division’s refusal to authorize approval of a distribution of surplus self-insurers’ funds which will not impair the financial solvency of the trust, is inconsistent with the Division’s powers over the administration and distribution of such funds. The Division obviously considers that the rules authorize it to restrict disbursement of funds derived from the contributions of members, to members only — not non-members — apparently as a means of protecting the investments of non-participating members, when such members would no longer continue to benefit from the continued activities of non-members, here the Underwriters. Although appellants make a very cogent argument that the Division no longer should have any interest in the distribution of such funds once it is determined that their financial solvency is not impaired, the above rules do not so limit the Division’s discretion, but in fact give it broad powers of approval over who should receive disbursement of surplus funds.
While the construction placed on the applicable rules by the hearing officer might be preferred by us, it is clear that the judiciary may not restrict the range of an agency’s interpretative powers once such agency has responded to rulemaking incentives and has allowed affected parties to help shape rules they know will regulate them in the future; therefore permissible interpretations must and will be sustained, even though other interpretations are possible and may even seem preferable according to some views. State Department of Health and Rehabilitative Services v. Framat Realty, Inc., 407 So.2d 238, 242 (Fla. 1st DCA 1981). Restated, the deference owed to a regulatory agency in its interpretation of statutes that it is authorized to administer is as follows:
Agencies are afforded wide discretion in the interpretation of a statute which it administers [sic] and will not be overturned on appeal unless clearly erroneous. Pan American World Airways, Inc. v. Florida Public Service Commission and Florida Power & Light Company, 427 So.2d 716, 719 (Fla.1983). The reviewing court will defer to any inter *384-386 pretation within the range of possible interpretation. Department of Health and Rehabilitative Services v. Wright, 439 So.2d 937 (Fla. 1st DCA 1983); Department of Administration v. Nelson, 424 So.2d 852 (Fla. 1st DCA 1982); State, Department of Health and Rehabilitative Services v. Framat Realty, Inc., 407 So.2d 238 (Fla. 1st DCA 1981).
Natelson v. Department of Insurance, 454 So.2d 31, 32 (Fla. 1st DCA 1984) (emphasis in original).
We therefore defer to the agency’s interpretation and
AFFIRM.
SHIVERS and JOANOS, JJ., concur.

. RGAF-SIF had earlier solicited its members to join the newly created RGAF-Underwriters and to procure workers’ compensation from such entity. Those members that did join entered into a subscription agreement whereby they assigned to RGAF-Underwriters any surplus funds held by the trustees on October 1, 1981 (the change-over date), from insurance issued through RGAF-SIF to insurance coverage issued by RGAF-Underwriters. Of the more than 200 subscribers and members of RGAF-SIF, less than 20 elected not to participate in RGAF-Un-derwriters.

. Both the hearing officer and the agency agreed that whether the non-participating members’ endorsements and acceptance of the amounts transferred to them could be said to be a waiver of any right they might have in any additional undistributed surplus income was not within the scope of an administrative proceeding. Since the effect of the restrictive endorsements was not made an issue below, we do not address it on appeal.